**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TIMOTHY MULLINS,                                    Case No. 1:10-cv-822

        Plaintiff,                                    Barrett, J.
                                                    Bowman, M.J.
  v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff, Timothy Mullins, filed this Social Security appeal challenging the Defendant's finding that he is not disabled. *See* 42 U.S.C. § 405(g). Proceeding through counsel, Plaintiff presents five claims of error, all of which Defendant disputes. As explained below, I conclude that the Administrative Law Judge's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

**I. Summary of Administrative Record**

Plaintiff filed an application for disability insurance benefits (DIB) in April, 2008, alleging a disability onset date of August 3, 2007 due to a hernia and surgical complications therefrom (Tr. 180, 209). After Plaintiff's claims were denied initially and upon reconsideration, Plaintiff filed a request to present his case *de novo* before an Administrative Law Judge ("ALJ.") (Tr. 3). Represented by counsel, Plaintiff attended a disability hearing held in Cincinnati, Ohio on February 23, 2010 before ALJ Christopher

B. McNeil. In addition to testimony from Plaintiff, the ALJ heard testimony from medical expert Dr. Walter Hulon, and from vocational expert Dr. Donald Shry.

On April 22, 2010, the ALJ entered his decision denying Plaintiff's DIB application. (Tr. 21-30). Plaintiff was 49 years old on the alleged onset date, but was 51 years old at the time of the ALJ's decision. The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Defendant's final determination.

In his "Findings," representing the rationale of his decision, the ALJ determined that Plaintiff meets the insured status requirements through December 31, 2012, that he has not engaged in substantial gainful activity since August 3, 2007, and that he has the severe impairment of deep vein thrombosis. (Tr. 23). The ALJ also determined that Plaintiff suffers from other physical impairments that are not severe, "including a hernia that resolved within less than 12 continuous months, migraines, allergic rhinitis, gastroesophageal reflux disease, asthma, hypertension, hypercoagulation, obesity, lumbar disc disease, and kidney stones." (*Id.*).

The ALJ further determined that Plaintiff does not have an impairment or combination of impairments that meets or equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25). The ALJ concluded that Plaintiff retained the following residual functional capacity ("RFC") to perform a reduced range of "light" work as follows:

> [H]e can occasionally lift not more than 20 pounds; can frequently lift no more than 10 pounds; can push or pull not more than 10 pounds frequently, with hand or foot controls; can sit, stand, and walk up to 6 hours each in an 8 hour work day; cannot use ladders, ropes, or scaffolds; can use ramps and stairs not more than frequently; can stoop not more than occasionally; can balance, kneel, crouch, or crawl not more than frequently; and must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.

(Tr. 25).

Although the ALJ concluded that Plaintiff's RFC did not permit him to perform any of his past relevant work, he determined that based upon his age, education, work experience and RFC, he could perform jobs "that exist in significant numbers in the national economy." (Tr. 29). Therefore, the ALJ found Plaintiff not to be disabled.

On appeal to this court, Plaintiff maintains that the ALJ erred by: 1) finding that Plaintiff's hernias and residual complications were not a "severe" impairment; 2) failing to adequately consider Plaintiff's obesity; 3) disregarding the medical expert's testimony at the hearing; 4) rejecting the opinion of Plaintiff's treating physician; and 5) failing to find that Plaintiff met GRID Rule 201.10.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §423(a), (d). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A). In this case, Plaintiff alleges that the five identified errors require this court to reverse the Commissioner's decision. Although the record presented is not without error, the errors committed by the ALJ did not impact the ultimate determination that Plaintiff is not disabled, which conclusion is supported by substantial evidence in the record.

### B. Specific Errors

### 1. Two Assertions of Error at Step 2: Consideration of Plaintiff's Hernias and Obesity as "Severe" Impairments

Step 2 of the sequential analysis requires the ALJ to determine the Claimant's "severe" impairments. Plaintiff sought DIB based upon a hernia that developed in August 2007, and complications arising therefrom, which complications included a second hernia. Plaintiff complains that the ALJ erred when he failed to find that Plaintiff's hernias and their residual effects constituted a "severe" impairment. *See* 20 C.F.R. §404.1520(a)(4)(ii). Plaintiff also complains that the ALJ failed to adequately consider his obesity as a severe impairment at Step 2. Because the two asserted errors are closely related, they are discussed together.

For an impairment to be "severe," the effects of the impairment must last or be expected to last at least twelve months. 42 U.S.C. §423(d)(1)(A). In this case, the ALJ determined that Plaintiff's hernias did not constitute a severe impairment because they

were surgically repaired and medically resolved within less than twelve months of the occurrence of his first hernia. In addition, the ALJ determined that Plaintiff's obesity was not a severe impairment because it did not impact Plaintiff's work ability. *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)("an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience").

In layman's terms, Plaintiff has a "fat belly," (Tr. 60), caused by a combination of his hernias and residual effects therefrom, and weight gain following two surgeries that resulted in a diagnosis of abdominal obesity. (Tr. 587). Plaintiff asserts on appeal that the ALJ failed to recognized his severe abdominal pain and significant restrictions resulting from his abdominal impairments, which Plaintiff contends both individually and in combination cause him to be disabled.

### a. Medical Evidence Relating To Hernias

Plaintiff's hernia issues began when he was hospitalized on August 6, 2007 and diagnosed with a significant hiatal hernia, with bowel meshed in the hernia, and gastric outlet obstruction. (Tr. 329-30, 445-450). On August 7, 2007, Plaintiff underwent surgery to repair the hernia. (Tr. 285, 323-25, 441-442). Plaintiff was released from the hospital on August 17, 2007 with CT evidence of a small partial bowel obstruction. (Tr. 314). Following the surgery he developed a wound infection, deep venous thrombosis and a pulmonary embolism, for which he was treated with medication. (Tr. 286, 308-310, 429-431).

The ALJ cited to evidence that demonstrated that Plaintiff was medically recovered from his first hernia by December 2007. (Tr. 27). By early September 2007,

Plaintiff's medical records reflected that Plaintiff's hiatal hernia was "almost healed" and was healing "well." (Tr. 284-85, 483). Likewise, records dated October 4 and October 9, 2007 reflected generally good healing of the original hiatal hernia site. (Tr. 284, 482). However, there is no question that the records also reflect that Plaintiff suffered from significant complications that the ALJ failed to discuss. (*See* Tr. 286, noting that Plaintiff had a "stormy course" postoperatively with deep vein thrombosis, pulmonary embolism, and other complications). For example, Plaintiff's surgical wound was left partially open and draining during the same period of time due to an infection. (Tr. 285-286, 484). In addition, Plaintiff developed, post-operatively, a second "wide mouth ventral hernia which suggested partial dehiscence of the anterior abdominal wall." (Tr. 397-398). By December 3, 2007, Plaintiff's ventral hernia had continued to enlarge, ultimately requiring a second surgery. (Tr. 283-284).

Rather than focusing on the post-operative complications, the ALJ more selectively focused on the post-operative report of Plaintiff's treating physician that Plaintiff could return to work after the repair of his hiatal hernia, (Tr. 27), but for the fact that Plaintiff's prior job required "very heavy lifting." However, the same October 4, 2007 note reflects Plaintiff's development of a second "ventral hernia," which enlarged so much over time that it eventually required surgical repair. (Tr. 482). Even the medical expert, Dr. Hulon, testified at the evidentiary hearing that Plaintiff had severe restrictions during his immediate post-operative period. (Tr. 53).

On January 22, 2008, Plaintiff underwent a second surgery to repair his large ventral hernia. The surgeon placed an inferior vena cava filter due to Plaintiff's pulmonary embolus and deep venous thrombosis. (Tr. 404, 420-21, 485). In the

course of repairing the ventral hernia, Dr. Zyyat also placed mesh measuring 10 x 14 inches, with two drains, into Plaintiff's abdomen. (Tr. 402-403, 488-489). Plaintiff was released from the hospital on January 26, 2008. (Tr. 400, 421). Although the ALJ found that the hernias themselves were surgically resolved in less than twelve months, Plaintiff persuasively argues that the ALJ erred in disregarding evidence that Plaintiff's post-surgical complications lingered for far longer than twelve months.

Medical records reflect Plaintiff's consistent complaints to his physicians that his abdominal muscles are lax, that he cannot comfortably wear regular clothes or a belt, and that he continued to experience abdominal pain and functional limitations for some period after his second surgery. Dr. Brown, a treating physician, has completed three questionnaires opining that Plaintiff must wear an abdominal binder and is restricted in his physical abilities. (Tr. 545-546, 554-558, 592-595). Dr. Brown's last functional capacity opinion was provided in January 2010, nearly two years following Plaintiff's repair of his second hernia. (Tr. 592-595).

The ALJ found just one complication relating to Plaintiff's first hernia repair to be "severe" - his deep vein thrombosis. To the extent that medical evidence suggests that Plaintiff suffered from additional complications from the two hernias that lasted more than 12 months, including his treating physician's opinion that the residual effects of the hernias restricted Plaintiff's work abilities and required him to wear an abdominal binder, the ALJ should have found the hernias to be "severe." However, as discussed below, an error at Step 2 of the sequential analysis does not require remand in every case, absent evidence that the error would have impacted the rest of the sequential analysis.

### b. Obesity

Plaintiff also argues that the ALJ erred in failing to find his abdominal obesity to be a "severe" impairment. On February 1, 2008, Plaintiff was 5 foot 11 inches in height and weighed 236 pounds. (Tr. 544). On February 29, 2008, Plaintiff had lost fifteen pounds, and weighed 221 pounds (Tr. 543). By October of 2008, Plaintiff had regained the lost weight and then some, weighing 246 pounds. (Tr. 541). Dr. Brown recorded Plaintiff's Body Mass Index as between 32.75 and 34.43 from October 2008 through October 2009 (Tr. 562-589). There is no dispute that Plaintiff has been diagnosed with abdominal obesity. (Tr. 587).

SSR 02-1p defines a BMI of 30.0 or above is obese. SSR 02-1p further states that obesity is "not severe" only when it has no more than a minimal effect upon an individual's ability to perform basic work activities; the same ruling directs the fact-finder to evaluate the severity of functional limitations caused by obesity on a case-by-case basis. Plaintiff complains that, because the ALJ did not articulate the basis for finding Plaintiff's obesity to be non-severe, he must have relied upon Dr. Hulon's erroneous testimony that obesity is defined as a BMI of 38-40, rather than the correct standard of a BMI in excess of 30 (Tr. 71).[1]

To the extent that Dr. Hulon erroneously defined the obesity standard, the ALJ does not appear to have relied upon that testimony. Instead, the ALJ expressly found that Plaintiff does suffer from obesity, but that Plaintiff's obesity is not a "severe" physical impairment. (Tr. 23). While the issue of whether Plaintiff's obesity should have been categorized as a "severe" impairment at Step 2 of the sequential analysis is

---

[1]Defendant does not dispute that Dr. Hulon incorrectly defined the standard for obesity.

close, substantial evidence supports the ALJ's conclusion that Plaintiff's obesity did not significantly impact his work abilities. Therefore, even if the ALJ erred at Step 2, any error would be harmless.

### 2. Two Assertions of Error Relating to Plaintiff's Residual Functional Capacity and Limitations Caused by Hernias and Obesity

Errors at Step 2 of the sequential analysis will not necessarily require reversal, if the ALJ finds at least one "severe" impairment and therefore continues with the remaining steps in the sequential process. That is because in determining a plaintiff's residual functional capacity and ability to work later in the sequential process, the ALJ must consider even the impairments found not to be "severe" at Step 2. *See Maziarz v. Secretary of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); 20 C.F.R. §404.1520. Thus, regulations require an ALJ to "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone . . . ." 20 C.F.R. § 404.1545(e).

The ALJ makes an RFC determination based on "all of the relevant medical and other evidence. In general, [the claimant is] responsible for providing the evidence we will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3). The standard for considering non-severe impairments is described in 20 C.F.R. § 404.1545. Social Security Ruling 96-8p serves to clarify the regulatory analysis. Under SSR 96-8p, the SSA seeks to strike a balance between the inclusion of non-severe impairments and the exclusion of non-impairment conditions in the RFC analysis.

Plaintiff complains that both the effects of his hernias (including scarring, loss of muscle, and bulging), and his obesity, cause severe functional limitations that the ALJ failed to recognize. Limited to the argument on obesity, Defendant responds that no medical source has ever opined that Plaintiff's *obesity* would cause any work-related restrictions. In reply, Plaintiff protests that both Dr. Brown and Dr. Hulon opined that Plaintiff's obesity created more than minimal limitations on Plaintiff's ability to work.

Although Defendant's argument is closer to the mark, neither party's argument concerning restrictions solely relating to obesity is entirely supported by the record. Both Plaintiff's physician, Dr. Brown, and the medical expert, Dr. Hulon, testified that Plaintiff's large abdomen negatively impacts his physical abilities. (Tr. 556, 60-61). Plaintiff also testified that due to his large and distended abdomen, he has difficulty lifting, standing/walking, sitting, climbing, stooping, kneeling, crouching, crawling, reaching and pushing/pulling (Tr. 77-81). While the evidence supports a conclusion that Plaintiff's large and protruding abdomen impacts his RFC, the evidence is more ambiguous as to whether the impact from obesity is "more than minimal." No medical source has definitively concluded whether Plaintiff's protruding abdomen is primarily caused by his obesity, the lingering effects of his hernias, or some combination of both. Ultimately, however, it is unnecessary to ascertain the physical cause of Plaintiff's large abdomen, or whether either of the two possible causes constituted a "severe" impairment, so long as the ALJ correctly determined Plaintiff's RFC.

Two of Plaintiff's assertions of error focus more specifically on the ALJ's RFC findings. First, Plaintiff argues that, in determining Plaintiff's RFC, the ALJ erred by relying upon written interrogatory answers by the medical expert, Dr. Hulon, because

Dr. Hulon altered his answers at the hearing. Second, Plaintiff argues that the ALJ erred by failing to adopt the limitations found by Plaintiff's treating physician. The latter assertion of error will be discussed first.

### a. Treating Physician Rule

Dr. Brown, Plaintiff's regular treating physician for more than five years, provided three separate evaluations of Plaintiff's functional abilities, in which he opined that Plaintiff is limited to a restricted range of sedentary work. Although there were variations in Dr. Brown's opinions over time, all three forms showed very severe limitations that were rejected by the ALJ. Had the limitations been factored into the ALJ's assessment of Plaintiff's RFC, Plaintiff would have been found to be disabled.

The relevant regulation concerning the opinions of treating physicians, 20 C.F.R. §404.1527(d)(2), provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.*; *see also Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). Despite the "controlling weight" ordinarily given to the opinion of a treating physician, the same regulatory framework permits an ALJ to reject a treating physician's opinion, provided that he or she states "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(d)(2), §1527(d)(2).

The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> . . . these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of the claimant's medical

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting 20 C.F.R. § 404.1527(d)(2)). Thus, the treating physician rule requires "the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakely v. Commissioner of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

Exceptions to the weight mandated by the treating physician rule arise only where the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record. *See id.*; Soc. Sec. Rul. 96-2p. When the treating physician's opinion is not well-supported or is inconsistent with other evidence, the ALJ must use a set of factors to determine how much weight should be afforded to the opinion. These factors include, but are not limited to: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely*, 581 F.3d at 406. "[A] finding that a treating source medical opinion...is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Id.*, quoting Soc. Sec. Rul. 96-2p.

When the treating physician's opinion is not given controlling weight, the ALJ must provide good reasons for doing so. Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*, 581 F.3d at 406-407.  Only then, after examining whether the treating physician's opinion is supported by objective evidence, considering the factors that determine how much weight should be afforded the opinion, and providing a good reason for not following the treating physician rule, can the ALJ properly allocate less weight to the treating physician's opinion.  *See id.*, 581 F.3d at 406; *see also* Soc. Sec. Rul. 96-2p.

In this case, the ALJ was very detailed in explaining why he was giving Dr. Brown's three RFC opinions "little weight."  (Tr. 28).  The ALJ found that Dr. Brown's own clinical notes not only failed to support the extreme limitations he reported on the social security forms, but served as a stark contrast to those limitations.  (Tr. 27-28).  In addition, despite some improvement over time and the lack of any objective data to show worsening of Plaintiff's conditions, Dr. Brown's opinions concerning Plaintiff's functional limitations continually changed.  (Tr. 28).  The lack of objective tests or support, as well as other physicians' disagreement with Dr. Brown's opinions, provided the basis for the ALJ's rejection of them.  (*Id.*).  I find those reasons to be adequate on the record presented, despite minor flaws in the ALJ's analysis.

Dr. Brown first opined that Plaintiff would be limited to a reduced range of sedentary work in January of 2008.  The ALJ took note of the January 2008 assessment but apparently placed little reliance upon it in light of later assessments by Dr. Brown dating November 2008 and January 2010.  To the extent that the ALJ rejected the January 2008 assessment as contrary to objective medical evidence, Plaintiff argues persuasively that Dr. Brown's first assessment was supported by medical evidence,

because it was completed just days after Plaintiff underwent significant abdominal surgery to repair his second hernia. (*Compare* Tr. 53, testimony by Dr. Hulon that Plaintiff had "severe restrictions" post-surgery). However, for the same reasons (because the assessment related to Plaintiff's immediate post-surgical recovery period), Dr. Brown's initial assessment does not support a finding of long-term limitations.

In November 2008, Dr. Brown completed a second assessment in which he increased the severity of Plaintiff's restrictions, to just two pounds of lifting. Dr. Brown further opined that Plaintiff could not climb, stoop, kneel, balance, crouch and crawl, due to Plaintiff's need to wear an abdominal binder and report of continued abdominal pain. (Tr. 553-558). This second assessment was properly rejected by the ALJ as unsubstantiated, in part because it reflected even *greater* restrictions than those imposed by Dr. Brown immediately post-surgery, with absolutely no evidence that Plaintiff's symptoms or condition had worsened. (Tr. 27). It does not appear that Dr. Brown administered any type of tests or objectively measured Plaintiff's abilities, and the severe restrictions he lists are contradicted by his own clinical records. As the ALJ pointed out, just a few weeks earlier in October of 2008, Dr. Brown advised Plaintiff to increase his exercise as a way to lose weight and to help reduce his abdominal obesity, despite Plaintiff's need for an abdominal binder at the time. Yet, the primary basis cited by Dr. Brown in support of his November 2008 assessment was Plaintiff's need for an abdominal binder.

Similarly, in his third assessment dated January 2010, Dr. Brown provided for restrictions based upon the fact that Plaintiff's abdomen "is markedly enlarged and restricts bending, lifting, sitting, standing and walking." (Tr. 590-595). The degree of

restriction is extreme; Dr. Brown opines that Plaintiff can stand and/or walk not more than 2 hours per day, and can sit not more than 4 hours.  (Tr. 592-593).  Within the two hour period of standing and/or walking, Dr. Brown opines that Plaintiff can stand and/or walk not more than 15 minutes without interruption.  Dr. Brown also suggests that Plaintiff can sit for not more than a half hour at a time.  (*Id.*).

As the ALJ correctly noted, however, those extreme limitations are again contradicted by clinical records that show that "Dr. Brown has continually...recommend[ed] that the claimant stay active, telling him to exercise more." (Tr. 28, 585-587).  In fact, Plaintiff reported in April 2009 that he was "walking on the treadmill some."  (Tr. 568).[2]  In July 2009, Dr. Brown told Plaintiff "that he needed to find something to do, like volunteer work to help others."  (Tr. 28, 570-571).

Examination of all three assessments by Dr. Brown reflects that, in addition to Plaintiff's hernia complications and/or obesity, Dr. Brown referred generally to Plaintiff's prior diagnosed impairments of "asthma...kidney stones, lumbar disc disease, hypercoaguable state, the DVT [deep vein thrombosis] + pulmonary embolism, depression, anxiety, HTN, migraine HA, GERD, [and] allergic rhinitis."  (Tr. 591-592). However, none of those diagnoses support the extreme restrictions found by Dr. Brown.

Although Plaintiff refers to his own testimony as support for Dr. Brown's limitations, Plaintiff was deemed not to be fully credible by the ALJ. (Tr. 26). Plaintiff does not challenge the ALJ's credibility finding in this proceeding, which in any event,

---

[2] Although not noted by the ALJ, Plaintiff's difficulties with complying with Dr. Brown's diet and exercise directives were noted by Dr. Brown.  (*See* Tr. 578, noting "poor" compliance with exercise and "fair" compliance with diet).

appears to be supported by substantial evidence. Therefore, Plaintiff's testimony cannot be used to support the severity of restrictions found by Dr. Brown.

At the hearing, Plaintiff testified that his abdominal binder "does help" his discomfort (Tr. 81), but that he is physically restricted due to the lingering post-surgical effects of his hernias. Plaintiff explained that -even though "it's probably contrary to what any medical doctor might think"- he feels "like I've had a bowling ball sewed up inside of me," that moves and shifts with his position, "like there's nothing holding it in, even though I know the mesh is there." (Tr. 81). Notwithstanding Plaintiff's expressed concerns, his physicians have repeatedly advised him that his hernias are unlikely to reoccur due to the surgical repair, and to increase his physical exercise.

In addition to complications from his hernias, Plaintiff testified that he is unable to sleep and has extreme fatigue (Tr. 73-74), severe shortness of breath (Tr. 73), extreme swelling of his legs and ankles, an inability to walk any distance (Tr. 78), back problems including "[d]egenerative disc" (Tr. 79), and depression (Tr. 82-83). However, the ALJ found no medical support for several of Plaintiff's complaints, including his alleged shortness of breath (Tr. 24). Plaintiff testified that he has significant abdominal pain, but medical records do not reflect that he has sought or been prescribed pain medication, other than medicine for indigestion relating to his GERD. (Tr. 63-67). Other records also contradict Plaintiff's testimony. For example, in a note dated 10/18/09, Plaintiff reported that he was babysitting his granddaughter. Plaintiff tried to explain at the hearing that he only watches his granddaughter when her mother (who lives with Plaintiff and his wife) "run[s] to the store or something." (Tr. 84). However, Plaintiff also admitted that he drives weekly to the pharmacy or to the store for occasional items (Tr.

88).   Plaintiff reported that he did some housework including simple cleaning and preparation of simple meals, and some laundry.   In addition, he cared for the dogs, drove, ran errands, visited his family, and shopped with his wife.  (Tr. 227, 229).

To the extent that Plaintiff's limitations are based on Dr. Brown's view of the lingering effects of Plaintiff's surgeries, it must be noted that Dr. Brown is Plaintiff's treating primary care physician, not a specialist.  The specialization of a physician is one factor to be considered when an ALJ strays from the treating physician rule. *Blakely*, 581 F.3d at 406.   The ALJ found that Dr. Brown's opinion was contradicted by the clinical record of Plaintiff's hernia surgeon, Dr. Goel, who opined in October 2007 that Plaintiff could return to work (except for the heavy lifting required).   Of course, the support provided by Dr. Goel's opinion is somewhat limited by the fact that it was offered prior to the January 2008 surgical repair of Plaintiff's second hernia.

The ALJ also cited the contrary opinions of Dr. Hulon in support of his rejection of Dr. Brown's opinions.  As discussed below, the ALJ's analysis of Dr. Hulon's opinions was not free from error.   Relatively minor errors notwithstanding, however, the ALJ's rejection of Dr. Brown's very extreme RFC is supported by substantial evidence, because the unusually severe restrictions were contradicted by Dr. Brown's own records, and unsupported either by objective medical evidence or by the record as a whole.

### b.  Dr. Hulon

Relying upon Dr. Hulon's pre-hearing responses to interrogatories, the ALJ suggested Dr. Hulon did not find Dr. Brown's opinions to be justified by the evidence.

(Tr. 28, 596-601). At the hearing, while continuing to disagree with the degree of Dr. Brown's restrictions, Dr. Hulon modified his original opinion and testified that Dr. Brown's restrictions were "not unreasonable." (Tr. 61). Merely because Dr. Hulon conceded that at least some of Dr. Brown's opinions were not "unreasonable," however, does not mean that the ALJ was required to accept them wholesale. As explained above, the ALJ's rejection of the most extreme limitations offered by Dr. Brown was supported by substantial evidence in the record as a whole.

On the other hand, Plaintiff's complaint that the ALJ failed to accurately characterize Dr. Hulon's testimony illustrates some error. Like the other errors noted in this Report and Recommendation, however, the error was harmless and did not affect the outcome of this case. Therefore, no remand is required.

Based upon a clearer picture of the size of Plaintiff's abdomen and additional evidence presented at the hearing, Dr. Hulon modified some of the opinions expressed in his pre-hearing written responses. (Tr. 43, 60, 63-70). The ALJ's written opinion acknowledged that Dr. Hulon provided a different RFC assessment at the hearing, but declined to adopt Dr. Hulon's revised opinion in his written opinion on grounds that the original assessment by Dr. Hulon was "substantiated by objective evidence" and because "[t]he claimant would be unable to sit or walk at all if he were never able to balance or stoop." (Tr. 29).

Plaintiff argues that the ALJ erred in implying that Dr. Hulon testified that Plaintiff could never stoop. In this respect, no error is evident. While Dr. Hulon initially testified that Plaintiff could occasionally stoop, he subsequently agreed with Dr. Brown that Plaintiff should "never" "crawl, crouch, and stoop." (Tr. 89).

By contrast, the ALJ erred in rejecting Dr. Hulon's modified opinion on the basis that Dr. Hulon unreasonably opined that Plaintiff could never balance. Although Dr. Hulon initially seemed to so testify (Tr. 89), he later clarified his testimony to state that Plaintiff could "frequently" balance, to the extent that Plaintiff could walk or stand for six hours per day. (Tr. 95). The ALJ then asked the vocational expert ("VE") whether, based upon the clarification as to balancing, but with restrictions that Plaintiff can "never...stoop, kneel, crouch, [or] crawl," Plaintiff could perform any work. (Tr. 94). The VE testified that Plaintiff could perform unskilled light work based upon the clarified hypothetical. (Tr. 95).

Ironically, the ALJ's written opinion departed from the hypothetical presented by the ALJ to the VE at the oral hearing. In his written opinion, the ALJ found that Plaintiff could occasionally "stoop" and could "balance, kneel, crouch, or crawl not more than frequently." (Tr. 25). Unlike the hypothetical RFC orally presented to the VE at the hearing, the RFC stated by the ALJ in his written opinion is not supported by the record as a whole. By contrast, the oral RFC is supported by substantial evidence in the record as a whole, including by Dr. Hulon's modified opinions. When those modified restrictions were considered by the VE, including no stooping, kneeling, crouching or crawling, but frequent balancing, the VE testified that the Plaintiff would be able to perform a significant number of jobs in the "light" work category and therefore would not be disabled. Accordingly, remand for reconsideration of Dr. Hulon's modified hearing testimony is not required. *See Deaton v. Astrue*, 1:10-cv-461-SAS, 2011 WL 4064028 * 5 (S.D. Ohio Sept. 13, 2011)(discrepancy between ALJ's RFC as stated in written in opinion and RFC posed to vocational expert at hearing was harmless error, where

accurate hypothetical at hearing and oral testimony of VE provided substantial evidence to support non-disability finding).

### 3. Whether Plaintiff Met the Grid Listing

Plaintiff argues that the evidence from Dr. Brown supports a finding that he is restricted to a limited range of sedentary work, which, in light of his age of 51 and less than high school education level, would entitle him to a finding of disability under the Grid. In light of my conclusions that substantial evidence supports the rejection of Dr. Brown's RFC and further supports the residual functional capacity orally determined by the ALJ, this fifth assertion of error is also without merit.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

        */s Stephanie K. Bowman*
        Stephanie K. Bowman
        United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TIMOTHY MULLINS,               Case No. 1:10-cv-822

      Plaintiff,                Barrett, J.
                              Bowman, M.J.

v.

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b)(2), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).